CANAL ELECTRIC COMPANY, Commonwealth Electric Company, Cambridge Electric Light Company, Montaup Electric Company, Boston Edison Company, Massachusetts Municipal Wholesale Electric Company and New England Power Company, Plaintiffs,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Defendant.

Civ. A. No. 85–2902–Y.

United States District Court, D.Massachusetts.

July 17, 1990.

On Motion For Reconsideration Feb. 1, 1991.

Sander A. Rikleen, Widett, Slater & Goldman, Boston, Mass., Mark Bruckmann, co-counsel, Wendy Millman, Mendes & Mount, New York City, for plaintiffs.

Jeffrey N. Stevens, John A. Walsh, Boston Edison Co., Boston, Mass., for Boston Edison Co.

Ralph E. Loomis, Robert J. Brill, Cheryl LaFleur, Westborough, Mass., for New England Power Co.

Edward P. Leibensperger, Nutter, McClennen & Fish, Boston, Mass., John Ferriter, Begley, Ferriter, Lavelle & Welch, Holyoke, Mass., for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The procedural device of certifying unsettled but controlling questions of state law to the highest court in a state for definitive resolution is a development of creative federalism, one that has worked well in this circuit, *see, e.g., Ocasio–Juarbe v. Eastern Airlines, Inc.*, 902 F.2d 117 (1st Cir.1990) (certification to Supreme Court of Puerto Rico); *Aetna Casualty and Surety Co. v. Curley*, 902 F.2d 1034 (1st Cir.1990) (certification to Supreme Court of Rhode Island); *Chroniak v. Golden Investment Corp.*, 887 F.2d 361 (1st Cir.1989) (certification to the New Hampshire Supreme Court); *Gagne v. Carl Bauer Schraubenfabrick, GmbH*, 595 F.Supp. 1081 (D.Me. 1984) (certification to Maine Supreme Judicial Court). See generally, Holloway, *Certifying Questions to State Supreme Courts*, The Federal Appellate Judiciary in the 21st Century 93 (1990), and Wilkins, *Certification of Questions of Law: the Massachusetts Experience*, 74 Mass.L.Rev. 256 (Dec. 1989) noting the thoughtful treatment such certified questions have received from the Massachusetts Supreme Judicial Court.

In this case, however, this Court must recognize that it resorted to certification too soon upon a record that was not fully developed. The upshot is that, regretfully, despite the complete cooperation of the Supreme Judicial Court which thoroughly addressed the certified questions notwithstanding the inadequacies of the record, *Canal Electric Co. v. Westinghouse Electric Co.*, 406 Mass. 369, 372, 548 N.E.2d 182 (1990), still more remains to be done, a trial must be held, and a further appeal is in the offing.

The original certification grew out of a 1987 hearing on the motion of Westinghouse Electric Corporation ("Westinghouse") for summary judgment. Today, after receipt of the opinion of the Massachusetts Supreme Judicial Court, that motion is again pending before this Court.

## I. PROCEDURAL BACKGROUND

This contract action was commenced on July 19, 1985 by Canal Electric Company ("Canal") and other utility companies ("other Utilities") [1] against Westinghouse alleging breach of warranty, negligence, and violation of Mass.Gen.L. c. 93A, based on Westinghouse's sale of goods and services to Canal. On July 8, 1987, Westinghouse moved for summary judgment. On September 2, 1987, following oral argument, the Court took Westinghouse's motion for summary judgment under advisement and thereafter certified two questions of Massachusetts law to the Supreme Judicial Court. This Court asked whether the Limitation of Liability provision in the contract at issue was enforceable, assuming that the Westinghouse exclusive remedy provided by the contract had failed of its essential purpose and, if so, whether relief under Mass.Gen.L. c. 93A was barred as well. On January 9, 1990 the Supreme Judicial Court answered both questions affirmatively but restricted its analysis to the undisputed facts of the case. A second hearing on the motion of Westinghouse for summary judgment was held on February 13, 1990. Canal and the other Utilities argued that, notwithstanding the answers to the certified legal issues provided by the Massachusetts Supreme Judicial Court, factual issues still remained in dispute regarding whether Westinghouse's actions were willfully dilatory or a repudiation of warranty obligations, whether the contract provided a minimum adequate remedy as matter of law, whether incidental and direct damages are available to Canal and the other Utilities, and whether the other Utilities not in privity with Westinghouse can advance their claim pursuant to Mass.Gen.L. c. 93A.

---

**1.** Commonwealth Electric Company, Cambridge Electric Light Company, Montaup Electric Company, Boston Edison Company, Massachusetts Municipal Wholesale Electric Company, and New England Power Company.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "The burden is upon the moving party to establish the lack of a genuine, material, factual issue ... and the court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence." *Public Service Co. v. Westinghouse Electric Corp.*, 685 F.Supp. 1281, 1283 (D.N.H.1988) (citing *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 [1st Cir.1986]; *Knight v. Mills*, 836 F.2d 659, 664 [1st Cir.1987]; *Ismert & Assoc. v. New England Mut. Life Ins. Co.*, 801 F.2d 536, 537 [1st Cir.1986]).

## II.   FACTUAL BACKGROUND

An examination of the entire record pursuant to the standard just set forth reveals the following undisputed facts: In July, 1968, Canal Unit No. 1, a steam turbine generator manufactured by Westinghouse, began operating at the Canal Electric Station. Westinghouse sold rotating blades to Canal for use in the steam turbine generator.

Both parties agree that the written contract governing the sale of the blades was one of two Westinghouse Selling Policies, either Policy 1270 or Policy 1701 (formerly 1710). Since the parties disagree regarding which policy governs the sale, this Court will analyze the issues under Policy 1701 ("the Policy")—the policy that Canal asserts to govern here. The Policy provides an exclusive warranty for one year to the effect that Westinghouse's equipment

and services would be free of defects. Under the warranty, Westinghouse is liable to repair or replace any defective products discovered within the warranty period. The Policy also contains a Limitation of Liability provision.[2]

From 1968 until 1981 Canal did not experience any difficulties with the rotating blades in the high pressure section of the turbine. In March, 1981, Westinghouse performed a routine scheduled maintenance outage and discovered cracks in the row eleven rotating blades in the turbine. Canal told Westinghouse to replace the entire set of row eleven rotating blades pursuant to the terms of the Westinghouse Policy. Canal issued a written purchase order for the replacement blades and Westinghouse manufactured and installed them without charge.

Westinghouse performed another scheduled outage for maintenance in early 1983. Westinghouse noticed that some of the row eleven blades replaced in 1981 had developed cracks. Canal ordered another set of replacement blades pursuant to the terms of a Westinghouse Policy and issued a written purchase order dated March 7, 1983. The blades were manufactured and installed in the turbine generator by Westinghouse. Westinghouse invoiced Canal on April 19, 1983 in the amount of $40,750 for the price of the replacement blades, a sum which Canal paid.

On July 20, 1983, Canal's turbine was shut down due to high vibration levels. Cracks were discovered in the row eleven blades installed in March, 1983. The parties immediately began a joint investigation into the cause of the cracking and the possible options for repair. Three meetings took place during the summer of 1983.

---

**2.** The Limitation of Liability provision in Policy 1701 provides in pertinent part:

Westinghouse ... shall not be liable in contract ... or otherwise for any special, indirect, incidental or consequential damages whatsoever including but not limited to, loss of profits or revenue, loss of use of equipment or power system, cost of capital, cost of purchased or replacement power or temporary equipment, claims of customers of the Purchaser or damage or loss of property or equip-

ment, not included within Westinghouse's scope of supply or services under these terms and conditions. The remedies of the Purchaser set forth herein are exclusive, and the total liability of Westinghouse ... with respect to these terms and conditions, or anything done · in connection therewith such as the performance or breach thereof ... shall not exceed the price set forth for the work in the purchase order or individual authorization out of which the liability arises.

On August 8, 1983, Westinghouse issued to Canal a full credit for the price of the failed blades including the cost of opening and closing the turbine.

Canal alleges that Westinghouse had determined the extent of the damage caused by the blade failure by July 27, 1983 but refused to offer any repair options until September 7, 1983. Canal opted to replace the blades with new blades having an expanded and strengthened root. Canal's turbine Unit 1 was returned to service on November 21, 1983 with replacement blades designed, manufactured, and installed by Westinghouse. Canal alleges that it incurred a total of $2,300,000 in repair costs over the years to obtain reasonably reliable row eleven blades, which sum includes $1,800,000 in engineering and consulting fees.

Westinghouse alleges that the return of the order price and the manufacture and installation of new blades constitute full and complete performance of its warranty obligations under the Policy. Conversely, Canal claims that it incurred substantial losses as a result of the turbine blade failure and Westinghouse's inability to perform the exclusive remedy contemplated under the Policy. Canal seeks damages from Westinghouse for breach of warranty, negligence, and violation of Mass. Gen.L. c. 93A. In addition, Canal seeks $66,020 in damages for the cost of purchasing replacement power during the 124 day outage period in 1983 while the blades were being replaced, the cost of opening the turbine before the return to service on November 21, 1983 and the costs related to outages of the turbine in 1985, 1986, and 1987. Regarding the breach of warranty claim, Westinghouse alleges that their actions in response to the shut down of the turbine on July 20, 1983 were diligent and timely, and its investigation and presentation of options for returning the turbine to service were satisfactory. In addition, Westinghouse denies that it acted negligently or that the blades were defective.

Canal operates the electric power generating plant on behalf of the other Utilities. The other Utilities purchased power, either directly or indirectly, from Canal pursuant to "life-of-the-unit" contracts with Canal. The other Utilities are not in contractual privity with Westinghouse. They seek consequential damages against Westinghouse in the amount of $8,000,000 for the cost of replacement power during Canal's several outages. In addition, the other Utilities allege that Westinghouse's conduct was unfair and deceptive within the meaning of Mass.Gen.L. c. 93A. The other Utilities do not, however, claim bad faith, fraud, or other deceptive conduct on the part of Westinghouse in connection with this claim.

The following facts are disputed. First, Canal alleges that Westinghouse never successfully repaired or replaced the blades, nor could it determine the cause of the cracking or prevent its recurrence. Second, according to Canal, the baffle plate option which Westinghouse offered on September 7, 1983 did not fulfill the exclusive repair or replacement warranty. Canal argues that it intended the baffle to be an interim measure until an optimally designed blade was available, but Westinghouse refused to pay to reopen the turbine to install such blades. Furthermore, Canal alleges that Westinghouse failed to meet its obligation to repair or replace the defective blades in a "timely" manner because replacement blades were not immediately available, causing a 124 day delay until service was returned. For these reasons, Canal alleges that Westinghouse did not honor its exclusive repair or replacement warranty.

## III. THE ISSUES

As noted above, Canal and the other Utilities continue to press four grounds on which they claim they are entitled to a jury trial. The Court addresses each in turn.

A. Were Westinghouse's actions willfully dilatory or a repudiation of its warranty obligations?

In Massachusetts, the Uniform Commercial Code ("U.C.C.") has been enacted as chapter 106 of the Massachusetts General Laws. The code definition of repudiation is found in U.C.C. Comment 1 to

section 2–610 which provides: "anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *See* Restatement (Second) of Contracts, sec. 250 (1979). Uniform Commercial Code Comment 2 to section 2–610 states that "[i]t is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." In addition, the repudiation must "substantially impair the value of the contract to the other...." *See* U.C.C. sec. 2–610 (1957).

It is undisputed that the parties here are large, sophisticated corporations of equal bargaining power, capable of assessing and allocating risk, who entered into a contract which limited the seller's entire liability to a refund of the order price. Accordingly, the cases relied on by Canal—involving as they do consumer transactions where there was a significant disparity in bargaining power, a failure or refusal of the seller to perform the repair or replacement warranty, and no return of the purchase price— are inapposite here. *See Waters v. Massey–Ferguson, Inc.*, 775 F.2d 587 (4th Cir. 1985) (seller failed to repair consumer's tractor or refund the price); *Clark v. Int'l Harvester*, 99 Idaho 326, 581 P.2d 784 (1978) (transaction between an individual farmer and International Harvestor).

Here, the more persuasive and applicable cases involve commercial transactions between sophisticated parties involving complex goods. Especially pertinent is *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435 (S.D.N.Y. 1976), which involved a commercial transaction for a turbine generator—a complex, sophisticated piece of equipment—with the seller's liability limited to the return of the purchase price. The court upheld the Limitation of Liability clause despite the failure of a repair or replacement provision covering the twelve million dollar generator. The court found "no reason to disturb the consensual allocation of business risk" represented in a commercial agreement that was "painstakingly negotiated between industrial giants." *Id.* at 458. *Accord Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d 1081, 1087 (3rd Cir. 1980) (seller, although unsuccessful in correcting problems within the appropriate time, continued its efforts and therefore did not act unreasonably or in bad faith); *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1375 (9th Cir.1978) (summary judgment for seller, where in equal bargaining power transaction, the seller attempted to repair but was unable to do so; seller did not ignore his obligation to repair). In addition, the court in *American Electric*, 418 F.Supp. at 458, noted that an agreed upon allocation of commercial risk is especially appropriate where the product is a highly complex, experimental piece of equipment.

On the record of undisputed facts before this Court, Westinghouse's actions do not as matter of law constitute repudiation or willful dilatoriness. Westinghouse did not refuse to repair the blades, abandon Canal, or intentionally delay repairs. Accordingly, Westinghouse's inability to repair does not constitute repudiation of the repair obligation. Westinghouse acted in good faith, honored the repair or replacement warranty, and returned the purchase price.

B. Assuming there has been a failure of the essential purpose of the warranty, does the contract provide a minimum adequate remedy?

In answering the certified questions, the Massachusetts Supreme Judicial Court assumed that the Policy provides Canal with a "minimum adequate remedy." *Canal Electric Co. v. Westinghouse Electric Co.*, 406 Mass. at 375, 548 N.E.2d 182 (citing U.C.C. sec. 2–719). Canal, however, argues that genuine issues of material fact remain for determination concerning this issue. Canal is wrong.

Section 2–719 of the U.C.C. allows contracting parties, especially sophisticated, commercial entities, to allocate risk and to bargain for the limitation of remedies. M.G.L. c. 106 sec. 2–719 (1957). Uniform

Commercial Code Comment 1 to section 2–719 provides that:

> [P]arties are left free to shape their remedies to their particular requirements. . . . [I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract.

Section 2–719(2) provides in pertinent part: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act." M.G.L. c. 106 sec. 2–719(2). Comment 1 explains that section 2–719(2) applies to "an apparently fair and reasonable clause [which] because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain. . . ." *Id.* at Comment 2.

In *Deerskin Trading Post, Inc. v. Spencer Press, Inc.*, 398 Mass. 118, 124, 495 N.E.2d 303 (1986), the court stated that limiting damages to a refund of the purchase price in a contract between "sophisticated business entities, and where consequential damages in the event of a problem could be extensive, is a reasonable business practice. . . ." In *American Electric*, the court noted that " '[s]ection 2–719 was intended to encourage and facilitate consensual allocations of risks associated with the sale of goods. This is particularly true where commercial, rather than consumer sales are involved.' " 418 F.Supp. at 457 (quoting *V–M Corp. v. Bernard Distrib. Co.*, 447 F.2d 864, 869 [7th Cir.1971] ). Moreover, the *American Electric* court observed that where the contract provided for a damage recovery that was separate and independent from the limited warranty, the plaintiff was not left "without at least a 'minimum adequate remedy,' " notwithstanding the inadequacy of repair. *Id.* at 458–59.

On the present record there are at least three compelling reasons to rule unequivocally that the purchase price refund is a "minimum adequate remedy." First the Policy provides for a damage recovery separate and independent from the limited warranty. Second, the warranted item is a highly complex, sophisticated and in some ways experimental piece of equipment, a situation which is particularly appropriate for an agreed upon allocation of commercial risk. Third, the Policy here in issue is a commercial agreement negotiated between industrial giants of equal bargaining power and there is no reason to disturb the consensual allocation of business risk as between the parties. Canal is entitled to recover the price of the item—exactly what it had bargained for. This Court rules that the Policy legally provides Canal with a "minimum adequate remedy." U.C.C. sec. 2–719 Comment 1 (1957).

## C. Are incidental and direct damages available to Canal?

Uniform Commercial Code section 2–715(1) defines a buyer's incidental damages resulting from a seller's breach of contract as follows:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expenses incident to the delay or other breach.

M.G.L. c. 106 sec. 2–715(1) (1957). Incidental damages under U.C.C. section 2–715(1) must be "reasonable under the circumstances." U.C.C. sec. 2–715 Comment 4. *See Consolidated Data Terminals v. Applied Digital Data Systems Inc.*, 708 F.2d 385, 394 (9th Cir.1983) (buyer who purchased defective computers was allowed to recover all reasonable expenses incurred in inspecting, shipping, handling, and storing the defective computer units as incidental damages). Massachusetts courts allow incidental damages for those expenses which are reasonably related to "care and custody" of rejected goods. *See, e.g., Delano Growers' Cooperative Winery v. Supreme Wine Co.*, 393 Mass. 666, 680, 473 N.E.2d 1066 (1985) (incidental damages allow re-

covery of buyer's reasonable expenses incurred in handling rejected defective goods).

■ Direct or general damages arise naturally or ordinarily from the breach of the contract. U.C.C. section 2–714(2) provides:

The measure of [direct] damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted....

Direct damages constitute the general difference-in-value to the wronged party of the performance or goods tendered and the performance or goods as promised in the contract. *E.g. Horizons, Inc. v. Avco Corp.*, 551 F.Supp. 771, 780 (D.S.D.1982) (cost of repairing engine to operate as warranted constituted general damages for breach of warranty), *rev'd on other grounds* 714 F.2d 862 (8th Cir.1983); *Curtis v. Murphy Elevator Co.*, 407 F.Supp. 940, 948 (E.D.Tenn.1976) (cost of repairing elevators considered general damages under U.C.C. section 2–714[2] ).

■ In this case, the Limitation of Liability provision expressly precludes recovery of incidental damages. *See supra* note 2. Canal is thus unable to recover incidental damages pursuant to the terms of its contract with Westinghouse. The Limitation of Liability provision, however, does not disclaim all damages suffered in this case. The clause does not mention direct or general damages at all. Westinghouse contends that the repair of the turbine and the refund of the purchase price constitute a "minimum adequate remedy" of the full measure of Canal's recoverable damages and satisfies Westinghouse's entire obligation under the contract. Canal, however, claims that it has suffered direct or general damages by incurring the costs of determining and implementing a reliable repair of row eleven blades. Many of the damages claimed by Canal and the other Utilities are consequential, for example, the claims for economic loss. As such, these claims are barred under the Limitation of Liability provision of the Policy. Subject to the Limitation of Liability provision, however, Canal "should be entitled to recover the monetary equivalent of the benefit of [its] bargain, a recovery precisely described by section 2[–]714(2)...." *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d at 1375. A buyer is entitled to recover the difference between the value of what it should have received and what it actually received. Since Canal paid a significant portion of the engineering charges and independent consulting fees to help determine the means of repairing the faulty blades, a remedy under U.C.C. section 2–714(2) may be available for Canal. These expenses allegedly occurred because Westinghouse breached its contractual warranty, and these damages, if any, are therefore recoverable as direct damages.

■ In sum, the engineering and consulting fees paid by Canal may be considered direct damages and, if Canal's averments are substantiated at trial, Canal will be entitled to recover its direct damages pursuant to section 2–714 of the Uniform Commercial Code, provided that such damages "shall not exceed the price set forth for the work in the purchase order or individual authorization out of which the liability arises" as provided in the Limitation of Liability provision of Policy 1701. To this extent, since genuine issues of material fact remain concerning whether Westinghouse properly performed under the contract and, if not, which purchase orders pertain to the allegedly defective performance, Westinghouse's motion for summary judgment must be denied.

D. The viability of the claim of the other Utilities under chapter 93A of the Massachusetts General Laws?

■ A recent First Circuit decision held that "[t]he mere breach of a contract, without more ... would not violate 93A." *Chambers Steel Engraving Co. v. Tambrands, Inc.*, 895 F.2d 858, 861 (1st Cir.1990) (*citing Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 [1st Cir.1985] (citing *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243 [1979] )).

While it is possible that wrongful contractual repudiation, willful dilatoriness, or failure to provide a minimum adequate remedy in a form contract such as Policy 1701 might conceivably give rise to a claim under Chapter 93A—matters as to which this Court expresses no opinion—here those claims have all been resolved in favor of Westinghouse. All that remains is a simple breach of contract claim for direct damages. After *Chambers*, it is clear beyond peradventure that such a claim will not give rise to Chapter 93A liability. Accordingly, summary judgment on this issue must enter for Westinghouse.

## IV. CONCLUSION

As Canal has raised factual questions regarding the performance of the contract and the extent of direct damages which flow therefrom, those matters will have to be resolved at trial. In all other respects, Westinghouse's motion for summary judgment is ALLOWED.

## ON MOTION FOR RECONSIDERATION

This breach of warranty claim presents important legal issues which have resulted in protracted pre-trial proceedings. The motion of Westinghouse Electric Corporation ("Westinghouse") for summary judgment resulted in the certification of certain of these legal issues to the Massachusetts Supreme Judicial Court. The comprehensive opinion of that court in *Canal Electric Co. v. Westinghouse Electric Corp.*, 406 Mass. 369, 548 N.E.2d 182 (1990) significantly narrowed the issues remaining for trial but, due to the inadequacy of the record presented to that court, this Court was obliged to further consider the motion of Westinghouse for summary judgment. That further hearing resulted in a memorandum and order dated July 17, 1990 (*supra* at 622), which limited the trial to (1) proof of a certain alleged breach of an express warranty, *viz.* fretting, within the warranty period, in the bowels of a large turbine and, if such fretting occurred, (2) assessing the direct damages which flow therefrom. The same order dismissed the claims pressed by the plaintiff utilities other than Canal Electric Co. ("other utilities" and "Canal"). Not surprisingly, these rulings satisfied no one and resulted in cross-motions for reconsideration and further hearings.

■ The Westinghouse motion for reconsideration is without merit. This Court has already held that the language of Westinghouse Selling Policy 1701 created an issue for the jury. Memorandum and Order, November 5, 1990. Lest there be any doubt, this means that if Canal can prove that fretting inside the turbine occurred during the warranty period, Westinghouse has breached its express warranty. The Westinghouse motion for reconsideration is likewise DENIED on the issue of damages. This Court has already determined that, pursuant to the contract and upon proof of breach, Canal may recover direct damages but not incidental damages. *Supra* at 627–628. Separating direct from incidental damages presents questions of fact for the jury. *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435, 459 (S.D.N.Y.1976).

The motion for reconsideration of the other utilities who have seen their Mass. Gen.Laws ch. 93A claims dismissed is, however, of considerably more merit. When this Court earlier dismissed their chapter 93A claims, it reasoned that, as Canal's suit against Westinghouse had been narrowed to a simple breach of contract action, no chapter 93A claim could be maintained. *Supra* at 627–628, citing *Chambers Steel Engraving Co. v. Tambrands, Inc.*, 895 F.2d 858, 861 (1st Cir.1990); *Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir.1985); *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243 (1979).

■ The other utilities were quick to pounce on the flaw in this reasoning. True, the cited cases hold that a simple breach of contract action does not give rise to a chapter 93A claim. But, they argue persuasively, this is not such a claim. This, they properly point out, is a cause of action arising out of an alleged breach of an express warranty—conduct which constitutes a virtual *per se* violation of Mass.Gen.Laws

ch. 93A, § 2. *Maillet v. ATF–Davidson Co.*, 407 Mass. 185, 193, 552 N.E.2d 95 (1990) ("Generally, a breach of warranty constitutes a violation of G.L. c. 93A, § 2"); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 378, 548 N.E.2d 182 (1990) ("[A] business plaintiff [can] recover for 'a material and substantial' breach of warranty 'under c. 93A, § 11' "); *Linthicum v. Archambault*, 379 Mass. 381, 387, 398 N.E.2d 482 (1979) ("[A finding] that there was a material and substantial breach of warranty provides the plaintiff with ample basis for recovery under § 11 [of chapter 93A]; 940 Code Mass.Regs. § 3.01 (1986)") ("It shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty"). *Accord Calimlim v. Foreign Car Center, Inc.*, 392 Mass. 228, 235, 467 N.E.2d 443 (1984); *Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 577, 441 N.E.2d 1027 (1982); *Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 821, 434 N.E.2d 611 (1982); *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 702, 322 N.E.2d 768 (1975). Further, they reason that the limitation of liability clause in the contract between Canal and Westinghouse, while barring Canal's chapter 93A claim, *Canal Electric Co. v. Westinghouse Electric Corp.*, 406 Mass. 369, 377–79, 548 N.E.2d 182 (1990), is no impediment to their independent chapter 93A claims since they are not parties to the contract with the limitation of liability clause and chapter 93A claims for breach of warranty quite clearly may proceed even in the absence of privity of contract. *Maillet v. ATF–Davidson Co.*, 407 Mass. 185, 191, 552 N.E.2d 95 (1990) ("[A] lack of privity between plaintiff and defendant [does not bar] recovery under c[hapter] 93A § 9"); *Van Dyke v. St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 675, 448 N.E.2d 357 (1983) (Claimants held to be proper plaintiffs under Chapter 93A, § 9 even though they had no contractual relation whatsoever with the defendant insurer); *Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 581, 441 N.E.2d 1027 (1982) (Because lack of privity is no longer a defense under the warranty provisions of the Uniform Commercial Code, nonprivity plaintiffs can also maintain an action under Chapter 93A in a products liability case).

■ Upon reconsideration, this Court concludes that the plaintiff utilities other than Canal correctly argue the two points just discussed and that the dismissal of their chapter 93A claims was improper upon the ground advanced *supra* at 627–628. Still, further reflection persuades the Court that dismissal was proper on another ground. The other utilities allege that, due to Westinghouse's breach of warranty and the fact that the turbine it supplied Canal thus had to be removed from service for lengthy periods of time, they had to purchase alternative energy at rates far in excess of that available under their long-term contracts with Canal. They each seek to recover this cost differential from Westinghouse pursuant to chapter 93A, § 11.[1] These "economic" damages are simply not legally cognizable pursuant to chapter 93A § 11.

■ It is the general rule in the United States that a plaintiff cannot recover for purely economic injury under a tort-based cause of action. *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (Tort-based action cannot lie for purely economic losses but only for personal injury or property damage). In *East River*, the charterers of several vessels sued the manufacturer for defective turbines, alleging strict products liability and negligence. Only the turbines themselves were damaged, i.e., no personal injuries or property damage was alleged. The charterers sought recovery for cost of repair and lost income.

The Supreme Court refused recovery in tort for purely economic losses in an admiralty action.[2] Promotion of safety, the

---

**1.** *See* Second Amended Complaint, ¶¶ 74, 59, 65.

**2.** While *East River* is an admiralty decision, the Court applied land-based reasoning to determine the applicable principles of contract and tort law. *Id.* at 868, 106 S.Ct. at 2300.

Court reasoned, was the underlying purpose of products liability law, with the goal of protecting persons and property from injury and damage. *Id.* at 866–67, 106 S.Ct. at 2299–300. Injury to the product itself or recovery for disappointment in the product's performance invoked not tort law, but contract-based warranty law. *Id.* at 872, 106 S.Ct. at 2302. Such losses, unlike those in tort actions, involve economic considerations such as the value of the product, displeasure of customers, increased costs, and the like. *Id.* Tort law was not designed for the recovery of pecuniary losses; warranty law, conversely, guarantees the benefit of the bargain.[3] The two, the Court held, cannot be blended together, but must remain distinct. *Id.* at 870–71, 106 S.Ct. at 2301–02. *Accord Public Service Co. of New Hampshire v. Westinghouse Elec. Co.,* 685 F.Supp. 1281, 1285–86 (D.N.H.1988) (On similar facts, interpreting New Hampshire law as denying tort liability for purely economic loss). *See also Bay State Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor Co.,* 404 Mass. 103, 107, 533 N.E.2d 1350 (1989).

The general rule discussed in *East River* has long been recognized law in Massachusetts. The seminal case is *The Stop & Shop Cos. v. Fisher,* 387 Mass. 889, 899, 444 N.E.2d 368 (1983) (Hennessey, C.J.) ("[I]t is clear beyond dispute, and for obvious reasons, that policy rules limiting liability are recommended for application to cases like this one. In negligence cases, recovery has wisely been confined to physical damages to the plaintiff's property").[4]

The question remains, however, whether these general principles have any role in delimiting the contours of relief available under Chapter 93A, § 11, a statutory remedy which sweeps more broadly than traditional theories of contract or tort. After all, Chapter 93A "is a statute of broad impact which creates new substantive rights...." *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 693, 322 N.E.2d 768 (1975). "Such relief is in addition to, and not an alternative to, traditional tort and contract remedies." *Linthicum v. Archambault,* 379 Mass. 381, 383, 398 N.E.2d 482 (1979), citing *York v. Sullivan,* 369 Mass. 157, 164, 338 N.E.2d 341 (1975). *See Calimlim v. Foreign Car Center, Inc.,* 392 Mass. 228, 236, 467 N.E.2d 443 (1984).

Still, after careful reflection, this Court concludes that purely economic damages such as those alleged by the other utilities in this case cannot be recovered in an action under Chapter 93A, § 11. That section affords compensatory damages only to a "person ... who suffers any loss of money or property, real or personal, as a result of the use or employment by another ... of ... an unfair or deceptive set or practice...." Absent such loss, the proof of conduct amounting to an unfair or deceptive act or practice will not, standing alone, support liability under Chapter 93A, § 11. *Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 110–11, 406 N.E.2d 678 (1980) (Grant, J.). Here, the economic damages which the other utilities seek to recover from Westinghouse are tortious in nature, whatever the label used to characterize them. Indeed, unfair trade practices

---

**3.** Warranty law, moreover, allows a limitation in liability for manufacturers that tort law eliminates. Unable to reasonably foresee "persons downstream who may encounter its product," *id.* at 874, 106 S.Ct. at 2304, the Court reasoned that a manufacturer might be liable to sub-charterers and customers for economic losses, unduly extending a manufacturer's liability. *Id.*

**4.** This decision grew out of a complaint alleging that the defendants' vessels, by negligently colliding with and obstructing a drawbridge, substantially impaired access to two established retail stores operated by the plaintiff, The Stop & Shop Companies, with the result that the plaintiff suffered economic harm from the loss of business revenues. In the Massachusetts Su-

perior Court, Special Master Brian Callahan, Professor of Law, Suffolk Law School, recommended ruling that such a complaint stated no claim for relief on the theory of negligence. Chief Justice Lynch approved this recommendation without opinion, apparently because the law was settled on this point. *The Stop & Shop Cos. v. Fisher,* Suffolk Superior Ct. No. 40952, Recommendation of the Special Master endorsed by Lynch, C.J. (Mass.Superior Ct., June 4, 1981, *affirmed in part and reversed in part on other grounds,* 387 Mass. 889, 899, 444 N.E.2d 368 (1983). In this complaint, no claim under Chapter 93A, § 11 was raised—nor, apparently, could any such claim have been advanced.

consist of tortious conduct, falling "within at least penumbra of some common-law, statutory, or other established concept of unfairness, or [conduct which is] immoral, unethical, oppressive, or unscrupulous...." *Quaker State Oil Refining Corp. v. Garrity Oil Co. Inc.*, 884 F.2d 1510, 1513 (1st Cir.1989); *see also Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979) (Kass, J.) ("The objectionable conduct must obtain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce"). Complaining of tortious conduct, the other utilities cannot here seek recovery for the increased cost of replacement power—just the type of pecuniary loss that *East River* and *Stop & Shop* held was not cognizable in tort. That said, the entire Chapter 93A claim collapses as no recoverable damages are here alleged and proof of such damages is an essential element of a claim under Chapter 93A, § 11.[5] Accordingly, the dismissal of the Chapter 93A, § 11 claims of the other utilities was correct, albeit upon grounds different from those earlier advanced.

 Finally, Canal seeks reconsideration in order to revive its own Chapter 93A, § 11 claim, asserting that, wholly apart from its contractual rights—and the limitations thereon—a mere breach of warranty creates a Chapter 93A, § 11 violation. Ca-

nal Motion for Reconsideration, p. 4. Canal relies, however, upon a handful of cases based in consumer protection (violating Chapter 93A, § 9),[6] rather than commercial transactions (violating Chapter 93A, § 11). *See, e.g., Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 701, 322 N.E.2d 768 (1975) (used automobile); *Linthicum v. Archambault*, 379 Mass. 381, 387, 398 N.E.2d 482 (1979) (house repairs); *Jeffco Fibres, Inc. v. Dario Diesel Services, Inc.*, 13 Mass.App.Ct. 1029, 1031, 433 N.E.2d 918 (1982) (used truck). Upon the undisputed evidence of the wholly commercial transaction between Canal and Westinghouse, there is here at most nothing more than a mere breach of contract as to which Canal has knowingly limited its liability. The Memorandum and Order of July 17, 1990 is correct in this regard. *Supra* at 627.

### CONCLUSION

Westinghouse' motion for reconsideration is DENIED. The motion of the other utilities for reconsideration is DENIED, albeit on different grounds. Canal's motion for reconsideration is DENIED. So much of the action as remains shall stand for trial.

---

**5.** The propriety of this result is confirmed by considering the practical effect of a contrary rule. In this case, Canal may well convince a jury that Westinghouse has committed a material and substantial breach of an express warranty. Westinghouse has thus committed an unfair or deceptive act, ostensibly violative of Chapter 93A, § 11. Who shall recover the economic damages thus caused? Canal, having knowingly waived its statutory rights and run the risk of these consequential damages, is out of luck. *Canal Electric Co. v. Westinghouse Electric Corp.*, 406 Mass. 369, 399, 548 N.E.2d 182 (1990).

The other utilities may recover, of course, if the breach of the Westinghouse warranty, standing alone, will support such recovery. But why stop there? Surely economic damages cannot be so neatly limited. What of the customers who purchased electric power from these other utilities and paid increased electric rates as a consequence? They too suffer economic dam-

ages and that is not all. Certainly some of these latter customers are in business themselves and have customers of their own to whom they pass on, *inter alia,* their increased electric costs. Thus the clients of the lawyer and the customers of the butcher, baker, and candlestick maker all suffer economic damages traceable to the Westinghouse breach as well. What of them? The mind boggles. Surely, if Canal can contractually waive its Chapter 93A, § 11 remedy because its dispute with Westinghouse "is a purely commercial one that does not affect the public interest," *Canal Electric Co. v. Westinghouse Electric Corp.*, 406 Mass. 369, 379, 548 N.E.2d 182 (1990), Chapter 93A, § 11 is not to be interpreted to so far displace the limitations on tort-based claims as to spawn this plethora of lawsuits.

**6.** Generally, Chapter 93A, § 9 is available only to consumers. *Slaney, supra,* 366 Mass. at 701, 322 N.E.2d 768 ("The § 9 private remedy is available only to a consumer....").